[Crim. No. 324.  In Bank.—September 15, 1898.]

THE PEOPLE, Respondent, v. JACK ARRIGHINI, Appellant.

CRIMINAL LAW—HOMICIDE—EVIDENCE—MANNER AND APPEARANCE OF DEFENDANT.—Upon the trial of a defendant accused of the murder of his brother, where there was evidence that the defendant fired the fatal shot under the belief that his brother was a tramp approaching toward him in a threatening attitude, and that after the shooting he exhibited signs of great grief, and that he was ill, and under the effects of a large quantity of quinine, at the time of the shooting, witnesses for the prosecution who observed the appearance and manner of the defendant shortly after the homicide, may be asked if they saw anything strange or peculiar in his manner.

ID.—ANTICIPATION OF DEFENSE—HARMLESS ERROR.—The prosecution should not have anticipated the defense with evidence as to the manner and appearance of the defendant shortly after the homicide; but error in introducing such evidence at the wrong time will not justify a reversal.

ID.—CROSS-EXAMINATION OF DEFENDANT—IMPEACHMENT—PERJURY.— Upon cross-examination of the defendant as a witness in his own behalf, it is not competent to introduce, for the purpose of impeachment, evidence showing that he committed willful perjury at the coroner's inquest, upon a matter concerning which he had not testified in chief.

ID.—EVIDENCE OF SPECIFIC ACTS.—Specific bad acts, or specific instances of untruthfulness, cannot be shown for the purpose of impeaching a witness.

ID.—ATTACK UPON DEFENDANT'S CHARACTER.—A defendant cannot be cross-examined as to other matters for the purpose of discrediting him by an attack upon his character, which does not concern the matter about which he has testified.

ID.—CONSTITUTIONAL PROTECTION OF DEFENDANT.—A defendant accused of crime in this state has a constitutional right to be protected from forced examination as to any matters concerning which he has not voluntarily testified in his own behalf; and no evidence can be wrung from him.

ID.—WAIVER.—A defendant does not waive his constitutional right to protection by taking the stand as a witness; nor can he bind himself in advance to waive it.  He may claim his right when the occasion arises.

APPEAL from a judgment of the Superior Court of Nevada County and from an order denying a new trial.  F. T. Nilon, Judge.

The facts are stated in the opinion of the court.

Thomas S. Ford, for Appellant.

W. F. Fitzgerald, Attorney General, and C. N. Post, Deputy Attorney General, for Respondent.

TEMPLE, J.—The defendant was tried upon a charge of murder and convicted of manslaughter. The appeal is from the judgment and a denial of a new trial.

January 10, 1897, defendant, his brother Dominique, and their uncle Angelo Arrighini, dined with one Romori, at the latter's cabin in Truckee. After dinner, at about 6 o'clock P. M., he started to go "up town." There was some difficulty in finding the key to the cabin, and defendant went off alone toward his cabin, which was about two hundred feet away. Soon after his brother went in the same direction.

It seems that defendant went to the cabin occupied by his uncle, his brother, one Rogantini, and himself. In that vicinity, without cause or apparent purpose, he fired two shots from his revolver, and then, meeting his brother, he fired the remaining three shots at him, killing him almost instantly.

After the shooting the defendant exhibited signs of great grief and sorrow, protesting that he thought—in the feeble light —that a tramp was approaching him in an attitude which indicated that he was about to spring upon him.

Defendant had been ill for several days, and on that day had taken a large quantity of quinine—according to his testimony about forty grains. At the dinner the defendant had eaten no food, because of his illness.

Dr. Shoemaker testified at the trial that from forty to sixty grains would be an overdose to one unaccustomed to take quinine; that its effect was greater when taken upon an empty stomach; that it would produce dizziness, indistinct vision, and sometimes blindness; also severe headache, staggering, and vomiting. There was evidence that shortly after the homicide defendant staggered and fell down upon his face in a severe fit of vomiting.

There had been no quarrel between the defendant and the deceased, and there was no evidence of ill-feeling or motive shown for the homicide. The uncle testified that there had been

occasional misunderstandings about trifling matters, but on the whole they had been friendly.

The first point raised by the appellant is, that the court erred in permitting the prosecution to ask certain witnesses as to appearance and manner of the defendant, shortly after the homicide. They were asked if they saw anything strange or peculiar in his manner. It is contended that this is in conflict with the final conclusion of this court in *Holland v. Zollner*, 102 Cal. 633, and with *Estate of Carpenter*, 94 Cal. 406; also with the case of *Marceau v. Travelers' Ins. Co.*, 101 Cal. 338.

In *Estate of Carpenter, supra*, to which the other cases refer, an attempt was made to avoid the rule which allows only intimate acquaintances to testify, by asking witnesses how he appeared mentally, not calling for a description of the manner or conduct of the person concerning whom the inquiry was being made, nor whether he acted rationally or irrationally at any particular time. Their opinions were asked as to his sanity, and it was said that it did not obviate the objection by asking if he appeared to be sane, or how he appeared mentally. In *Holland v. Zollner, supra*, it is said that this is not so much a matter of judgment as of observation. Undoubtedly it is both, and no one disputes that, apart from our statute, witnesses might be asked such questions as in regard to other matters mentioned in the opinion in that case, concerning which opinion evidence is held admissible. In that case, in denying a rehearing, the court reasserted the doctrine of *Estate of Carpenter, supra*. In *People v. McCarthy*, 115 Cal. 255, the court held that it was proper to ask a witness whether the defendant acted rationally, or appeared "rational" at a particular time. So I think any witness may testify to the demeanor of the defendant, whether he was intoxicated, appeared to be excited, was angry, or timid. Nor need such testimony always be confined to a special occasion. A witness may state whether the person was habitually melancholy, morose, peevish, irritable, or the opposite. And no doubt other mental habits may be testified to; such as whether he was incoherent, forgetful, or irrational. Anyone could tell if a person is totally lacking in mentality, or is a raving maniac. These are not, therefore, considered matters of judgment. But where a reasonable doubt can exist as to sanity, and it is made an issue

or subject of controversy in a case, the code prohibits the courts from receiving as evidence the opinions of those who are not intimate acquaintances.

I see no objection to the evidence in question here, except that it was put in at the wrong time. The prosecution should not have anticipated the defense, but such error will not ordinarily justify a reversal.

The defendant was a witness for himself. He testified that he and his brother were friendly; that he sent money to Italy to bring his brother to this country; that he had been ill for two or three weeks before the homicide; had taken large quantities of quinine; was sick and dizzy, and his sight obscured, and that on the next morning after the shooting, upon waking, he thought his brother was in bed with him, and tried to call him. On the examination his counsel questioned him as follows:

"State whether you intended to kill him. A. No, sir."

This was all the testimony given by the defendant for himself. On cross-examinaion the district attorney produced his testimony before the coroner's jury, and, showing his deposition, proceeded as follows: "Is this what you said [reading], 'My occupation is laborer; I don't remember nothing about the shooting as I was very drunk'?" Objection was here interposed that it was not cross-examination as to anything concerning which he had testified in his direct examination; he had not testified in regard to the circumstances of the shooting. The objection was overruled, and the witness testified that he did so testify. He was then asked if his testimony before the coroner was true. He admitted, in answer to questions, that it was not, and proceeded to testify, in effect, that he had deliberately perjured himself because he was advised that it was necessary to his defense that he should do so. He also, in response to questions, gave a full account of the homicide. He testified: "When I was walking down the street, I see some one coming out just like that [witness staggers forward, bent down, with hands stretched out]. He said, Ho, ho, ho [witness imitates peculiar groan], and I pulled out the pistol and started to shoot like that [turning head away]; then I see it was my brother, and then I picked him up and kissed him," et cetera. He further said: "Somebody came out between the two houses, and I have no time to walk back,

because I thought he was trying to kill me, and didn't know who it was," et cetera. He further related what he did after the killing—what he did with his pistol, and many other circumstances. None of this testimony had any connection with any matter concerning which defendant had been examined in chief, except that all may be said to have been relevant to the issues.

The killing was not denied by the defendant. The defense was, that the homicide was committed in self-defense, under the doctrine of apparent danger. This position had been already taken and evidence tending to support it had been introduced, although the defendant had not offered himself as a witness upon the subject. He had simply said that he did not intend to kill his brother. His defense was an admission that he did purposely fire the fatal shot, and the only possible effect of his testimony was that he did not know that the person killed, and whom he contended he thought was about to attack him, was his brother, and perhaps by implication that he had no malice or ill-will toward his brother. There was no attempt to prove express malice, and the jury did not find that there was malice. The verdict was evidently founded upon the proposition that the shooting was reckless, and I think that there was evidence to sustain such conclusion.

I think it obvious that the evidence given at the coroner's inquest did not tend to contradict the testimony of the defendant given at the trial, and therefore was not admissible, conceding that he can be impeached in that mode. Whether he was drunk or not had no bearing upon the question as to whether he knew it was his brother. The obvious purpose was not to contradict his testimony, but to make the witness admit that he had willfully given false evidence upon another matter before the coroner, and to make that fact an excuse for examining him as to all the facts in the case. In *People v. Devine*, 44 Cal. 452, it was held that, for the purpose of impeaching a witness, only those portions of the evidence given before the coroner could be read which showed that the witness had stated as a fact at one time what he denied at another, or had made statements materially different.

Now, was it competent to introduce evidence showing that upon another trial, upon a matter concerning which defendant had not testified upon his examination in chief, he had com-

mitted willful perjury for the purpose of impeachment? The answer must be in the negative. Specific bad acts, or specific instances of untruthfulness, cannot be shown for the purpose of impeaching a witness. (*People v. O'Brien*, 96 Cal. 171; Underhill on Criminal Evidence, sec. 236.)

After putting in the evidence given by defendant before the coroner, if that was competent, then it was proper to ask him further if his statement was true. If the evidence had stopped upon simply proving the statement made before the coroner, the ruling, though erroneous, would not, perhaps, have necessitated a reversal, because that statement by itself was so utterly immaterial that no harm could ensue. But when it was used as the means of the further cross-examination it became very harmful, and the harm, I think, came legitimately from the erroneous ruling permitting the cross-examination in regard to the testimony before the coroner.

The limitation contained in our code (Pen. Code, sec. 1323) was doubtless intended to preserve to defendants the right secured by section 13, article I, of the constitution. So limited, confessions which are not voluntary are not obtained, although as to the matter of the direct examination the cross-examination may be full and searching. Other states from which cases are cited do not contain such a limitation. In Massachusetts the provision is that he "shall at his own request, and not otherwise, be deemed a competent witness." It has been held that when, under this statute, the accused offers himself as a witness, he waives all protection guaranteed by the constitution and becomes a competent witness in the whole case. Under this ruling confessions are forced from him, under the sanction of law. So the inquisition of torture is restored, only without the rack and thumb screw. It has been well said that the rule has been reached by silent approaches. I think the constitution prohibits the obtaining of evidence by torture, even when the accused has been induced by the offer of some advantage to consent.

Under our statute there can be no doubt. Here, surely no evidence can be wrung from him. He can only be examined in regard to the matters concerning which he has voluntarily testified. (*People v. O'Brien, supra; People v. Gallagher*, 100 Cal. 466; *People v. McGungill*, 41 Cal. 429.) Missouri and Oregon

are the only other states which has this statute. In both, the decisions accord with ours. (*State v. McLaughlin,* 76 Mo. 320; *State v. Patterson,* 88 Mo. 88; 57 Am. Rep. 374; *State v. Lurch,* 12 Or. 99; *State v. Saunders,* 14 Or. 300.)

It is not always easy to determine what is cross-examination as to the matters testified in the direct examination. It was practically held in *People v. Mullings,* 83 Cal. 138, 17 Am. St. Rep. 223, that when a defendant testified simply that he was not guilty, he could be cross-examined as to the whole case. No other witness could have given such evidence. When defendant testifies to facts which simply have a bearing upon the question of innocence or guilt, the cross-examination must be confined to such facts, otherwise he is compelled to give evidence against himself. Doubtless the prosecution may seek upon a cross-examination to bring out evidence which tends directly to explain, qualify, or contradict his testimony. I say "directly," because it has been sometimes contended that, when the defendant testifies to a fact which is inconsistent with his guilt, proof of his guilt disproves his statements, and therefore he may be cross-examined as to all matters relevant to that issue. This would, of course, do away with statutory limitations entirely, for such would always be the case when he testified to anything relevant and material. It would always tend to refute the charge.

Witnesses do not testify to guilt or innocence, but to facts from which either may be inferred. These facts, and not the guilt or innocence they tend to prove or disprove, are the "matters about which he was examined in chief." For instance, suppose he testified to an alibi; proof of guilt would tend indirectly to disprove the alibi—simply because the alibi, if proven, disproves guilt. But this is not the matter concerning which the defendant was examined in chief. Any matter which tends directly to prove that he was not where he said he was may be inquired of—but not, for instance, the possession of stolen goods —though that would tend to prove guilt, and, therefore, indirectly, would disprove the alibi. The possession of the goods may have been acquired in some other way, and if the question were allowable it might open up another part of the case, concerning which the defendant has not volunteered any testimony. Judge Cooley was of the opinion that the privilege could not be

so waived as to authorize a court to compel a defendant to testify against himself; that his testimony must be voluntary when given—and no previous waiver, or agreement to waive this privilege, can be held against him.    (Cooley's Constitutional Limitations, 5th ed., 386.)

He cannot then be cross-examined as to other matters for the purpose of discrediting him by an attack upon his character. Surely this does not concern the matter about which he testified in chief.    A different view was taken in *People v. Johnson*, 57 Cal. 571.    There, however, the constitutional provision was not considered.    This plainly appears.    It is said that *People v. Brown*, 72 N. Y. 571, 28 Am. Rep. 183, was not in conflict; "Whether the question had any bearing on the credibility of the witness was not determined, but the objection to it was sustained on another ground, which was distinctly taken, that of privilege." The privilege was the constitutional provisions referred to, and Chief Justice Church and the court held, with Cooley, that the witness could not be compelled to answer if he claimed his privilege.    Under such circumstances, I do not think the authorities sufficient to practically repeal the statute, which, read with the constitutional provision, is capable of but one construction.

It is said a defendant may waive his constitutional right, and does so when he takes the stand.   Suppose he may waive the privilege, he cannot bind himself in advance to do so.   He may claim his right when the occasion arises.   It may be here noted, however, that, until this line of decisions, it was always held that to administer an oath to a defendant was a species of compulsion which, of itself, would render his statements inadmissible against him.

I think the ruling erroneous, and the judgment is therefore reversed and a new trial ordered.

Garoutte, J., Harrison, J., McFarland, J., Van Fleet, J., and Henshaw, J., concurred.