[Crim. No. 1372.   Fourth Dist.   Nov. 13, 1958.]

THE PEOPLE, Respondent, v. ANDERSON SIMS,
Appellant.

Thomas Whelan for Appellant.

Edmund G. Brown, Attorney General, and Lynn Henry Johnson, Deputy Attorney General, for Respondent.

McCABE, J. pro tem.*—Defendant appeals from a judgment of conviction after jury verdict of guilty of murder (second degree), and the order denying his motion for new trial.

On the evening of August 30, 1957, defendant went to the house wherein decedent occupied a room. At this particular time Frankie (a woman), one Johnson and decedent were in decedent's room. This room was some distance from the front screen door. Apparently defendant and decedent were acquaintances. Defendant testified he went to the house to tell Frankie that Shorty wanted to see her. This is testimony denied by Shorty. Whatever the reason, defendant called to Frankie through the screen door in the front of the house. Hearing this, Frankie left the room, the house and the premises. Defendant's conduct in calling Frankie from his house excited and angered decedent, who requested defendant to "Come in a minute. I want to talk to you." Defendant answered "No come outside and I will talk to you." Shortly after this conversation, decedent went out and onto the porch where defendant was standing. Johnson heard decedent say "he wanted him to stay away from his house," and decedent "didn't appreciate him coming and calling people out of his house," to which defendant replied: "You act like you are mad about it." Decedent said, "Yes, I am. I am plenty mad about it." After this verbal exchange Johnson heard scuffling on the front porch. From the vantage point of an officer who was patrolling the street and from that of Johnson who went to the door, it appears that decedent raised his hand in a pointing attitude in the direction of defendant. After that movement defendant grabbed decedent. They scuffled and the officer saw at least two underhanded movements of defendant's right hand toward the chest of decedent. Until the officer came between the two persons they continued to scuffle. Upon being separated and for a minute or two dece-

---

*Assigned by Chairman of Judicial Council.

dent stood, then tried to move, and finally fell to the ground. The officer handcuffed defendant and placed him against the wall of the house where he waited until police reinforcements arrived. Decedent was taken to a hospital, where he died shortly thereafter. While on the way to the police station defendant was asked the location of his knife. He then produced it from his right hand. It was in a closed position and had human blood on it. At his trial defendant testified that "Jessie come out and said, 'Didn't you call Frankie?' I said, 'Yes, there wasn't no harm in it.' He said, 'You black son-of-a-bitch, I am going to kill you,' and he out with his knife. I was standing there talking with Shorty and just had my little knife, talking to him, just playing with it in my hand. He grabbed his knife and opened it and I opened my own and I grabbed his arm like that and jerked him and cut him just like that. I had his arm and I never turned it loose and we walked all the way clean back to the porch. He forced me back against the wall and I jerked him away and grabbed him and I turned him loose. Shorty, this man, he said, 'This man is cut,' and he turned around and grabbed me by this arm and handcuffed my arms behind me. That was all that was done and that was all that was said." This testimony varies from the statement given by the defendant to an officer and also from the testimony of Shorty. Shorty testified that he was not present during the episode. On the way to the police station the defendant said "I am afraid if the policeman hadn't pulled me off him when he did I would have cut him worse." No knife was found on the decedent or in the vicinity of the crime. The medical testimony at the time of trial was that decedent died as a result of being stabbed in the heart.

For grounds of this appeal defendant states (1) the evidence is legally insufficient to support the verdict; (2) the prosecutor was guilty of prejudicial misconduct; and (3) the court erred in decisions of law arising during the trial.

We will take up points (2) and (3) and discuss them as one. At no time during prosecution's case did any witness testify as to prior offenses committed by defendant or as to any extrajudicial statement made by defendant in the nature of threats against third parties or any prior arrests of defendant. When the defendant took the witness stand in his own defense and on his direct examination, the defendant relied upon self-defense. The prosecution on cross-examination of defendant asked him a series of questions which were

objected to by the defense, which questions were in substance as follows:

"Q. Isn't it a fact, Mr. Sims, that approximately thirty to forty days prior to the time that you cut Jessie Nolden that you said to Mr. Jack Andrews at Mr. Andrews' place, or in front of Mr. Andrews' place, that all your brothers had killed a negro and that you were going to kill one, too?

"Q. Isn't it a fact that about two or three months prior to that time you said the identical thing to Mr. McAffey at his cafe when you walked in there without any clothes on and he put you out ——

"Q. Mr. Sims, do you often carry a knife? A. No.

"Q. Have you ever carried a knife before? A. No.

"Q. This is the first occasion you carried a knife, is that correct? A. Oh, I have carried knives, pocket knives like that for years, but I haven't had none lately.

"Q. Now, Mr. Sims, is this the first time you ever cut a person with a knife?

"Q. Is it the first time you ever threatened to cut a person with a knife?

"Q. As a matter of fact, you threatened people with both knives and guns over the past ten or twelve years, isn't that right?

"Q. Now do you recall, Mr. Sims, an incident prior to this killing of Mr. Nolden that happened possibly thirty or forty days prior thereto in which you made an assault upon a woman?

"Q. You never did make an assault upon a woman?

"Q. Isn't it a fact thirty or forty days prior to the time you killed Mr. Nolden right outside of Andrews' store you assaulted a woman with a garbage can cover and cut her mouth?"

The court in ruling upon one of the objections said: "No, it is proper to show his disposition." The objections which were interposed by the defense were that the questions were

not proper cross-examination, were incompetent, and improper. All of which objections were overruled by the trial judge.

After the answers were given, the defendant was confronted with a situation as to whether or not he, on redirect examination, should try to explain the answers. If he did not do so the jury would have before it the evidence elicited on the cross-examination and if he did, the prosecution might claim he waived any objection. Apparently the decision was made to explain his answers given on cross-examination and to deny the implications of the prosecution's question. The prosecution, having put the defendant in this position, on recross-examination of defendant proceeded to go into details of various incidences, brought out on the redirect examination. Also, on recross-examination the prosecution questioned about arrests, threats and fights concerning which defendant had not testified to either on cross or redirect examination. In questioning defendant about some prior arrests and when defendant denied them, the prosecution then produced "arrest reports," showed them to defendant, and asked defendant if these arrest reports didn't "refresh" his memory that he was arrested on certain prior specific dates. Defendant's counsel reminded prosecution he had not seen these reports and objected to them, and cited counsel's action as misconduct. To this the court said: "I am admitting it for the purpose, Mr. Langford (counsel for defendant), to see whether it refreshes his recollection. He said he had never . . ." When defense counsel observed to the court that the prosecution was before a jury and getting these reports into evidence through questions and this was improper, the prosecution stated he had laid a proper foundation. The court ordered counsel to proceed and stated the arrest reports were not going into evidence. Defense counsel then moved the court for a mistrial which was denied. After this the prosecution used the arrest reports in an attempt to "refresh" defendant's memory by such questions as: "Mr. Sims, I also show you for purposes of refreshing your recollection an arrest report dated July 9, 1944, charge of threatening a person with a gun, or exhibiting a gun." At proper times defense counsel interposed objections, made at least two motions for mistrial, and cited prosecution counsel's conduct as misconduct, all of which the court either overruled or denied.

Having established a record with the approval of the court, the prosecution on rebuttal, proceeded to attempt to impeach

defendant's testimony by the production of witnesses, each of whom had arrested defendant: one in 1936, one in 1944, and one in 1952. Another witness testified to hearing defendant utter threats against a third person. Another witness testified as to the "authenticity" of the arrest reports which had been marked for identification and used to "refresh" defendant's memory. This was the second occasion during the trial that these records were brought to the jury's attention as "arrest reports."

By the provisions of section 1323, Penal Code, which reads in part as follows: "A defendant in a criminal action or proceeding can not be compelled to be a witness against himself; but if he offers himself as a witness, he may be cross-examined by the counsel for the people as to all matters about which he was examined in chief . . ." it appears that there was the intention to preserve to defendant the right secured by section 13, article I of the Constitution (*People v. Arrighini*, 122 Cal. 121, 126 [54 P. 591].) In *People v. McCarthy*, 88 Cal.App.2d 883, 886 [200 P.2d 69], it is said:

"Numerous cases hold that section 1323 means exactly what it says as to the limitations on the cross-examination *of a defendant on trial*. Among them are *People v. Bishop*, 81 Cal. 113 [22 P. 477]; *People v. Wong Ah Leong*, 99 Cal. 440 [34 P. 105]; *People v. Crowley*, 100 Cal. 478 [35 P. 84]; *People v. Baird*, 104 Cal. 462 [38 P. 310]; *People v. Bishop*, 134 Cal. 682 [66 P. 976]; *People v. Frank*, 75 Cal.App. 74 [241 P. 924]; *People v. Gilliland*, 39 Cal.App.2d 250 [103 P.2d 179], and *People v. Darby*, 64 Cal.App.2d 25 [148 P. 2d 28]."

In *People v. Gallagher*, 100 Cal. 466, 475 [35 P. 80], in referring to section 1323, Penal Code, the court said:

"The effect of the latter clause of the above is to take from the court any discretion which it might ordinarily exercise in allowing the range of a cross-examination to extend beyond the matter brought out upon the direct examination. (See *People v. Rozelle*, 78 Cal. 84 [20 P. 36].) And to prevent the prosecution from questioning the defendant upon the case generally, and in effect making him its own witness. (*People v. O'Brien*, 66 Cal. 602 [6 P. 695].)"

The difference between the testimony of a defendant and that of other witnesses is discussed in several cases. (See *People v. McCarthy, supra*; *People v. O'Brien*, 96 Cal. 171, 180 [31 P. 45]; and *People v. Gallagher, supra*.)

114

■ Here, the prosecution went far beyond the testimony given by the defendant on his direct or redirect examination. Even though the prosecution, under a different rule of evidence, might have been able to get into evidence the incidences about which they questioned the defendant it cannot force the defendant to give this testimony and thus make him a witness against himself.

If the prosecution had not asked further questions of the defendant in this same area of inquiry it may not have been prejudicial error, but not being satisfied the prosecution then asked on recross-examination questions which were the same kind as had been asked on cross-examination and then proceeded to go into other areas of inquiry outside the scope of the direct or redirect examination, obviously attempting to lay the groundwork for "impeachment" of the defendant and fix the matters clearly in the minds of the jury. ■ Having been allowed by the court to do so, the prosecution then brought in numerous witnesses to contradict the testimony of the defendant, and thereby attempt to impeach him. A similar situation was presented in *People* v. *Rodriguez*, 134 Cal. 140, where the court, at page 142 [66 P. 174], said:

"If nothing further had occurred on the subject it possibly might have been held that appellant had not been prejudiced by the allowance of these improper questions; but when the prosecution, after having been allowed to introduce this irrelevant and collateral matter, was also allowed to introduce a witness to contradict what appellant had said on the subject, a different question is presented. 'A witness cannot be cross-examined as to any fact which is collateral and irrelevant to the issue, merely for the purpose of contradicting him by other evidence, if he should deny it, thereby to discredit his testimony. And if a question is put to a witness, which is collateral and irrelevant to the issue, his answer cannot be contradicted by the party who asked the question, but is conclusive against him.' (*People* v. *McKeller*, 53 Cal. 65; 1 Greenleaf on Evidence, Sec. 449.) The testimony of the sheriff contradicting the appellant on the collateral and irrelevant matter was therefore clearly inadmissible, and it would be idle to say that it could not have been prejudicial to appellant. In the first place, it tended to 'discredit his testimony', and in the second place, it tended to prove the commission of another and independent crime, which, of course, was entirely unwarranted. Something is said in respondent's brief about the statement of the sheriff that appellant was in the county

jail being 'voluntary'; but his examination by the people leads strongly to the conclusion that the statement in question was the anticipated and intended ultimate aim and outcome of his whole testimony. The remark of the court that 'the county jail part be stricken out' did not remedy the evil; it could not be stricken out of the minds of the jury.''

We are not deciding the question whether the incidences and events about which the defendant was questioned on his cross-examination and recross-examination could have been proved in prosecution's case in chief under the heading of similar offenses or as tending to show intent, plan or design. We are deciding that it was error to compel the defendant to be a witness for the state and against himself, and to allow his own testimony to be used as the foundation for the impeaching testimony employed against him.

It will be noted that the questions asked of the defendant were not questions regarding the commission of felonies but were specifically designed to bring out wrongful acts or questionable ones and, therefore, were clearly inadmissible under the terms of section 2051, Code of Civil Procedure. (See *People* v. *O'Brien, supra*; *People* v. *Arrighini, supra*.)

There can be no question in the instant case that the evidence was sufficient to convict defendant of a crime, but whether of murder or of manslaughter is not for this court to say. The question before this court is whether the substantial rights of defendant have been prejudiced and require a reversal of the judgment. In *People* v. *Braun,* 14 Cal.2d 1, 7 [92 P.2d 402], it is said:

''Whether the misconduct of a prosecuting attorney has prejudiced the substantial rights of a defendant must rest largely upon the facts of each case. An appellate court may only reverse the judgment when it appears from all the facts that there has been a miscarriage of justice. (Const., art VI, § 4½.) Obviously, conduct of a prosecutor which would amount to prejudicial misconduct in one case might not result in a miscarriage of justice in another case. In other words, there is no definite rule by which asserted misconduct may be measured for the purpose of determining whether it prevented the defendant from having that fair and impartial trial which the law required for every person charged with a crime.''

The trial court allowed the prosecution to propound questions to the defendant and to other witnesses which had the effect of etching certain impressions of defendant on the

minds of the jury. In addition to this the court improperly allowed the prosecution to introduce evidence through witnesses which could have had the sole effect of inflaming the minds of the jury. Under the evidence in this case the jury could have brought in a verdict of manslaughter. Under this state of the record, the errors committed might have been a deciding factor with the jury. The effect of the accumulation of errors on the part of the prosecution and court might very well have caused the jury to bring in the verdict of murder.

We therefore decide that the cumulative effect of the errors was prejudicial to the substantial rights of the defendant, resulting in a miscarriage of justice and requiring this court to reverse the judgment of conviction, and thus entitling defendant to a new trial.

In view of the opinion of this court necessitating a reversal we will not consider the other contentions raised by appellant.

Judgment and order denying a new trial are, and each is, reversed.

Griffin, P. J., and Mussell, J., concurred.