[Crim. No. 1385.   Fourth Dist.   Apr. 30, 1959.]

THE PEOPLE, Respondent, v. HARRY STANLEY
BROWN, Appellant.

Thomas Whelan for Appellant.

Stanley Mosk, Attorney General, Clarence A. Linn, Chief Assistant Attorney General, and Peter T. Kennedy, Deputy Attorney General, for Respondent.

GRIFFIN, P. J.—As a result of a jury trial defendant-appellant Harry Stanley Brown was convicted of burglary, second degree. He admitted a prior felony conviction (violation of Veh. Code, § 503). A motion for new trial was denied.

Defendant and one John Griggs had known each other for about 10 years. Previously, defendant had lived in the Griggs home for several weeks and knew that a key to the house was kept in the garage. Spencer Griggs and his wife also lived there on January 22, 1958. In their bedroom, on top of the dresser, they kept a piggy bank with about $25 in it. They had other money in the dresser drawer. On the morning of January 23d Spencer's wife went to work at about 5:30 a. m., John Griggs left about 6:20 a. m., and Spencer about 7 a. m. All doors were locked. When the wife returned home that evening she discovered the piggy bank and its contents were gone, in addition to $40 which had been kept in the dresser drawer. She said as she unlocked the front door she thought the back door flew open. Griggs' landlady, living next door, said she saw defendant go into the garage and then to the front door of the Griggs home and enter it about 10 a. m. on January 23d. She positively identified defendant in court. The landlord also testified he saw defendant in the vicinity of that home at that same time. Another neighbor said she saw him the same day about the same time, getting out of his car which he parked in her driveway, saw him walk to the Griggs home and stand at the front door, but she did not see him leave.

One witness said defendant made a $25 payment on a loan in her office on January 23d, after 11 a. m. A police officer found the receipt for this amount in defendant's wallet on January 24th. Defendant told him he had not been working and that a Mr. May had loaned him the money; that he paid the finance company a loan of $25 about 1 p.m. on January 23d. May testified defendant had worked for him at one time and that he had loaned him money on occasions but had not loaned him any money on January 23d.

A gas station employee testified defendant came to his station about 11 a. m. on January 23d, had his car greased, and paid back a $4.00 debt he owed, bought $3.00 worth of gasoline, left about three-quarters of an hour later, and that he usually bought gasoline in small amounts such as 50 cents to 75 cents at a time.

Defendant's wife testified on that day defendant took her to her grandmother's home about 9:30 a. m. and about 10 a. m. left and didn't return until 11:15 a. m. Defendant's mother testified she loaned her son about $100 in different amounts in January, and $30 on January 22, but none on January 23d.

▆ Defendant testified he went to the grandmother's home about 9:30 a. m., went to the gas station to get his car checked for grease and that his car was there until 11 a. m. and he then returned to his grandmother's home. He denied going to or near the Griggs home that morning. He admitted knowing where the key to their house was kept, but said he did not use it. He denied telling the officer he paid the finance company $25 at 1 p. m. on January 23d or that he said he had just borrowed money from Mr. May. Defendant admitted his previous conviction of a felony. On cross-examination he was asked if he had ever seen piggy banks in anybody's bedroom. He stated he had not. He did admit he knew one of the Griggs boys kept his money in the house and that all members of the household were working on January 23d, but he was not sure about one brother. He was then asked if he knew a Mr. and Mrs. Hawthorne and he said he did. He was then asked on cross-examination: "Do you remember back in 1950, when you entered their home and took a piggy bank off the dresser drawer, or off the top of the dresser and took money out of their dresser?" Objection was made and the court said: "Well, he may inquire. It is to show similar offenses. That is the only purpose for which it is admitted, and modus operandi, and so forth. . . . A. I was an accomplice to that, but I wasn't in the house." A motion to strike this line of testimony was denied. The officer was called and he testified to the fact that defendant did tell him that in 1950 he entered the Hawthornes' home; that while in the house he had ransacked the dresser, where he found money, and also had broken open a piggy bank and removed the money. The motion for a mistrial was denied. In explaining away this testimony, counsel for defendant in his argument to the jury said the claimed similar offense was introduced for the limited purpose of showing intent and not to show a course of conduct of continued criminality. The trial

judge reemphasized this statement to the jury and specifically instructed it that such evidence was received for a limited purpose only; that its value, if any, depended on whether or nor it tended to show the identity of the person, intent, or that there existed in the mind of the defendant a plan, scheme, system or design, into which fitted the commission of the offense for which he was then on trial. This form of instruction has legal support, and evidence of similar offenses, when not too remote, are admissible either in chief or on rebuttal. (*People* v. *Cavanaugh,* 44 Cal.2d 252 [282 P.2d 53] ; *People* v. *Peete,* 28 Cal.2d 306 [169 P.2d 924] ; *People* v. *Freytas,* 157 Cal.2d 706, 719 [321 P.2d 782].) Defendant concedes this general rule of law but claims the facts shown do not indicate a similar plan, scheme, system or design, and accordingly the evidence was inadmissible for any purpose. █ Usually, it is a primary question for the court to determine whether facts pertaining to offenses other than that charged show a general pattern, scheme or plan and are sufficiently similar and possess a sufficiently high degree of common features with the act charged to warrant an inference that if defendant committed the others he committed the one charged, and the question of remoteness usually goes to the weight and not to the admissibility of the evidence. (*People* v. *Grimes,* 113 Cal.App.2d 365 [248 P.2d 130].) See also *People* v. *Peete, supra.*

█ The trial court apparently believed that such evidence should go to the jury for its enlightenment under the limited instruction that it could be considered only for the purposes indicated. It will be presumed the jurors were true to their oaths and followed the various admonitions and instructions of the court. While a close question is presented, we believe the claimed offense had sufficient similarity to justify the submission of that evidence to the jury. (*People* v. *Cavanaugh,* 44 Cal.2d 252 [282 P.2d 53] ; *People* v. *Coefield,* 37 Cal.2d 865 [236 P.2d 570] ; *People* v. *Westek,* 31 Cal.2d 469 [190 P.2d 9] ; *People* v. *Cook,* 148 Cal. 334 [83 P. 43] ; *People* v. *Sykes,* 44 Cal.2d 166 [280 P.2d 769] ; *People* v. *Peete,* 28 Cal.2d 306 [169 P.2d 924].) *People* v. *Sims,* 165 Cal.App.2d 108 [331 P.2d 799], relied upon by defendant, was factually different. There, the question whether the other offenses proved, in the manner there accomplished, were or were not *similar offenses* was not the issue. The evidence was not admitted on that theory but attempt was made to elicit the commission of other crimes, not similar in form, from defendant, by means of cross-examination and by way of impeachment, and the court there told the

jury it was admissible for the purpose of showing criminal *"disposition."* It is fundamental that other offenses are not admissible for the purpose of showing criminal disposition. (*People* v. *Peete, supra.*) In the instant case the prosecution offered the testimony of the officer in chief as to what he knew and what defendant told him about the previous similar offense. The trial court refused it but allowed it to be produced after defendant testified, by way of rebuttal, as bearing on the question of intent. No prejudicial error resulted. (*People* v. *Watson,* 46 Cal.2d 818, 836 [299 P.2d 243]; *People* v. *Brice,* 49 Cal.2d 434 [317 P.2d 961]; Cal. Const., art. VI, § 4½.)

Finally, it is argued that the trial judge improperly threw the weight of his official position against the defendant and engaged in what defendant felt were acts of advocacy to his prejudice, citing *People* v. *Lancellotti,* 147 Cal.App.2d 723 [305 P.2d 926]; and *People* v. *Huff,* 134 Cal.App.2d 182 [285 P.2d 17]. There was some dialogue between counsel for defendant and the trial judge as to whether the incident in 1950 was or was not similar. No objections were made in reference to the remarks of the trial judge, and no motion was made to strike it. The judge stated to the jury that, to him, there was sufficient similarity to allow that evidence to be considered by the jury, even though counsel for defendant argued otherwise. In view of the conclusions reached and the giving of the specific instruction on the subject, we conclude that no prejudicial error resulted.

Judgment and order denying a new trial affirmed.

Mussell, J., and Shepard, J., concurred.