[Crim. No. 11286. First Dist., Div. One. Mar. 27, 1974.]

THE PEOPLE, Plaintiff and Respondent, v.
VERONICA M. BAGWELL, Defendant and Appellant.

128

## COUNSEL

James Larson, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Edward A. Hinz, Jr., and Jack R. Winkler, Chief Assistant Attorneys General, William E. James and Edward P. O'Brien, Assistant Attorneys General, Derald E. Granberg and Clifford Thompson, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**ELKINGTON, J.** — Defendant Veronica Bagwell appeals from a judgment based on a jury verdict finding her guilty of second degree murder.

There was little factual disagreement on the evidence which was properly placed before the jury.

Defendant's husband was having an affair with another girl and he had commenced an action for dissolution of their marriage. On the evening of the day that she was served with summons defendant obtained a knife from the kitchen, went to the bedroom where her husband was lying, and stabbed him in the chest. The knife pierced the victim's heart eventually causing his death. The People's evidence tended to prove that although

clothed, he was stabbed in his sleep, and that defendant had intended to kill him. Her testimony indicated that he was awake at the time and had seen her coming with the knife and that she had intended only to "hit him," not to kill him.

I. ■ A knife which was apparently the death instrument was, over objection, admitted in evidence at the trial. Relying on *Chimel* v. *California*, 395 U.S. 752 [23 L.Ed.2d 685, 89 S.Ct. 2034], defendant contends that this was prejudicially erroneous.

Following the stabbing Mr. Bagwell had somehow gotten into his pickup truck and driven to a gas station where, looking as though he were about to pass out, he said, "Get me to the hospital." An ambulance and the police were called. He told the police he had been stabbed by his wife. A police officer then went to his home where the door was opened by defendant who identified herself as Mrs. Bagwell. The policeman entered and placed her under arrest for the assault. Standing in the front room the officer observed an "obvious blood trail" leading into a hallway. He followed the trail to a bedroom where on the bedstand was a bloodstained "butcher knife." That knife is the subject of the instant assertion of error.

Defendant's argument, in its effect, is that *Chimel* required the police officer to leave the premises and seek a search warrant authorizing him to follow the blood trail into the bedroom.

It seems well to note that *Chimel* reiterated the basic rule that " '[t]he recurring questions of the reasonableness of searches' depends upon 'the facts and circumstances—the total atmosphere of the case,' . . ." (395 U.S. at p. 765 [23 L.Ed.2d at p. 695].) California has stated the same rule in this manner: " 'There is no exact formula for the determination of reasonableness. Each case must be decided on its own facts and circumstances . . . and on the total atmosphere of the case. . . .' " (*People* v. *Superior Court (Kiefer)* 3 Cal.3d 807, 827 [91 Cal.Rptr. 729, 478 P.2d 449, 45 A.L.R.3d 559]; *People* v. *Ingle,* 53 Cal.2d 407, 412 [2 Cal.Rptr. 14, 348 P.2d 577] [cert. den., 364 U.S. 841 (5 L.Ed.2d 65, 81 S.Ct. 79)].)

We first consider the facts and circumstances—the total atmosphere—of *Chimel*. There, although the police had an unhampered opportunity to seek a search warrant, their entry was authorized only by a warrant for Chimel's arrest for burglary. Over his objection officers spent an hour and 45 minutes rummaging through a three-bedroom house, including its attic, garage and workshop. In the course of the search Chimel's wife was directed to open drawers and " 'to physically move contents of the drawers from side to side so that [they] might view any items that would have come from [the]

burglary.' . . ." (395 U.S. at p. 754 [23 L.Ed.2d at p. 688].) The high court characterized the police activity as "a top-to-bottom search of a man's house." (395 U.S., pp. 766-767, fn. 12 [23 L.Ed.2d at p. 696].) And it quoted with approval the following comment of Judge Learned Hand (p. 767 [23 L.Ed.2d at p. 696]): " 'After arresting a man in his house, to rummage at will among his papers in search of whatever will convict him, appears to us to be indistinguishable from what might be done under a general warrant; . . .' "

The *Chimel* court found no justification "for *routinely* searching any room other than that in which an arrest occurs—or, for that matter, for searching through all the desk drawers or other closed or concealed areas in that room itself. Such searches, in the absence of well-recognized exceptions, may be made only under the authority of a search warrant. . . ." (Italics added; 395 U.S. p. 763 [23 L.Ed.2d p. 694].)

Recent California cases construing *Chimel* have also emphasized that *routine searches* of rooms other than that in which an arrest is made will not be tolerated. They have made it clear, however, that the *facts and circumstances of the case* may nevertheless permit entry of other parts of the house. Where the officer is in another room where he "has a right to be," he may seize any evidence which is within his "plain sight." But to justify such a seizure "he must be able to point to specific and articulable facts from which he concluded that his action was necessary. . . ." (*People* v. *Block,* 6 Cal.3d 239, 244 [103 Cal.Rptr. 281, 499 P.2d 961]; see also *Guidi* v. *Superior Court,* 10 Cal.3d 1, 6 [109 Cal.Rptr. 684, 513 P.2d 908]; *North* v. *Superior Court,* 8 Cal.3d 301, 306-307 [104 Cal.Rptr. 833, 502 P.2d 1305]; *People* v. *Shepherd,* 33 Cal.App.3d 866, 869-871 [109 Cal.Rptr. 388]; *People* v. *Superior Court (Irwin)* 33 Cal.App.3d 475, 479, 480 [109 Cal.Rptr. 106]; *People* v. *Superior Court (Fall)* 31 Cal.App.3d 788, 798 [107 Cal.Rptr. 756].)

It will be seen that the facts and circumstances of *Chimel* differ greatly from those of the case at bench. Here, standing in the front room where defendant had been arrested, the officer observed blood drippings leading from that point into the connecting hallway. Having a right to seize evidence in plain sight for later judicial use, he had a corresponding right to closely observe this incriminating indicia of violence for the same evidentiary purpose. This continuing observation led him to the far end of the hallway where he, accordingly, "had a right to be." At that point the trail of blood led his eyes to the bedroom where in plain view was the death weapon.

We observe that the arrest of Chimel was for burglary of a coin shop. If, perchance, a scattering of the stolen coins went from the point of arrest through a hallway and into another room, it is doubtful that any reasonable person would deny the police right to seize this evidence as it trailed from one room to another. And along this line of travel, being where he had a right to be, the officer would be permitted to seize such other evidence as loomed into his plain view. No rational distinction may be made between such a continuing seizure of a trail of stolen coins and the continuing observation of the blood trail of this case.

There was no "routine search" of other rooms by the officer of the case before us, and he was able to "point to specific and articulable facts from which he concluded [as we do] that his action was necessary." We therefore find neither *Chimel* nor other constitutional fault in the trial court's admission of the questioned evidence.

II. ■ A police officer went to the service station to which Mr. Bagwell had driven. He observed that the victim was bleeding from the right side of his chest, appeared "extremely weak," and "seemed to be gasping for air and choking." Bagwell told him, "I don't think I'm going to make it." A few minutes after his arrival at the hospital he told another officer that his wife had stabbed him, and "[I was] in my bed asleep and I felt a sting and I woke up and saw a knife sticking out of the right side of my chest. I pulled the knife out. I don't remember anything else after that."

These statements of Bagwell were admitted in evidence, over objection, by the trial court upon the theories that they were "dying declarations and spontaneous declarations of the victim." The ruling is assigned by defendant as error.

We first consider the contention that the statements were not "dying declarations" as defined by Evidence Code section 1242, which requires that such declarations be made "under a sense of immediately impending death." ■ Whether or not the declarations were so made must be determined preliminarily by the trial court, and "unless there has been an apparent abuse of discretion in that regard, the ruling of the trial court will not be disturbed on appeal. . . ." (*People* v. *Tahl,* 65 Cal.2d 719, 725 [56 Cal.Rptr. 318, 423 P.2d 246] [cert. den., 389 U.S. 942 (19 L.Ed.2d 294, 88 S.Ct. 301)].)

■ Defendant's specific contention is that the words, "I don't think I'm going to make it" did not indicate "a sense of immediately impending death." But it has been held that expressions such as " 'he did not see how he could live' " (*People* v. *Hoffman,* 195 Cal. 295, 307 [232 P. 974]),

"she did not expect to recover" (*People* v. *Mount,* 93 Cal.App. 81, 84 [269 P. 177]), and "he didn't expect to live" (*People* v. *Pollock,* 31 Cal.App.2d 747, 754 [89 P.2d 128]) were sufficient basis for admission of dying declarations. We conclude that the trial court did not abuse its discretion in holding that Bagwell's statement, and his critical condition which was obviously known to him, established a dying declaration.

Since admission of the dying declaration was not error, we find it unnecessary to pass upon the theory that it was also a "spontaneous declaration" as defined by Evidence Code section 1240.

III. No merit is found in defendant's contention of *Miranda* (*Miranda* v. *Arizona,* 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]) error. Substantial evidence indicates that the police properly explained to her the rights announced in that case. We find the trial court's ruling—"I feel that there was a knowing, voluntary and intelligent waiver, that she did understand what was going on, that she did exercise her own free will and that the statements that she did make are admissible"—to be fully supported by the record. We may not disturb it on appeal. (*People* v. *Lara,* 67 Cal.2d 365, 392 [62 Cal.Rptr. 586, 432 P.2d 202] [cert. den., 392 U.S. 945 (20 L.Ed.2d 1407, 88 S.Ct. 2303)].)

IV. ■ Toward the close of the People's case in chief the prosecutor, out of the presence of the jury, offered to prove that about a year earlier, in Los Angeles, defendant had committed a similar assault which had resulted in the victim's death. It was apparently offered as tending to establish an intent to kill in relation to the offense for which she was on trial. (See Evid. Code, § 1101.) After an extended hearing the trial court ruled "that the probative value is outweighed by the possible prejudicial effect and therefore should be excluded insofar as submitting it as another offense to show the intent, the malice or the premeditation." (See Evid. Code, § 352.)

Counsel for defendant then pressed the court for a ruling as to whether cross-examination would be permitted on those matters. He stated: "There's the dilemma she faces. Is she going to be forced into a position where she may have to decide not to take the witness stand to defend herself as to these charges because she's going to be subjected to cross-examination on the Los Angeles charges in what we could consider to be in violation of her rights as to those charges, that's the box she's in." The court, after listening to argument, indicated, "I will have to wait to see how it develops. I can't rule in a vacuum but we've discussed the cases. . . . As far as her questions are concerned, we'll proceed cautiously and you should get a ruling from the Court before we get into an area that may be within this orbit that we've just discussed so after the direct examination if you feel there's

any area you [the prosecutor] can go into, then we should either be approaching the bench or in some other way have some discussion as to what the limitations might or might not be. . . . *We'll see how the testimony develops on her direct examination."* (Italics added.)

On defendant's direct examination no reference whatever was made to the Los Angeles affair. From the trial court's earlier response, which we have emphasized, she might reasonably have concluded that no cross-examination on the subject would be allowed.

Defendant took the stand in her own behalf and, as previously indicated, admitted the assault upon her husband but insisted she intended only to "hit him," not to kill him.

Thereafter, pointing to the "butcher knife" of the case, the prosecutor launched into the following cross-examination:

"Q. Have you ever used a knife like that to strike anybody?

"A. No.

"Mr. Baskin [the public defender]: Objection, Your Honor, this question violates my client's Fifth Amendment Rights.

"The Court: Overruled. The answer may stand.

"Mr. Johnson [the district attorney]: Q. Isn't it true, Mrs. Bagwell, that on July the 13th of 1970—

"Mr. Baskin: I'm going to object at this point. I'm anticipating the question which I think will violate my client's privilege against self-incrimination. This question is beyond the scope of direct examination and I think under 352 of the Evidence Code it should be not allowed.

"The Court: Would you both approach the bench?

"(Off the record discussion.)

"Mr. Johnson: Q. Did you ever see a butcher knife like this before?

"A. Yes.

"Mr. Baskin: Your Honor, I believe there was an objection pending before the Court based on the last question.

"The Court: Yes, he's withdrawn the question and asked another question.

"Mr. Baskin: I see.

"Mr. Johnson: Q. Have you ever seen a knife like this before?

"Mr. Baskin: Objection, Your Honor, objection, not relevant. Everybody's seen a knife like that before.

"THE COURT: She may answer.

"THE WITNESS: That's our knife. I've seen that before.

"MR. JOHNSON: Q. You have seen a knife like this?

"A. That's the knife in the house, I have seen it before.

"Q. You have seen your own butcher knife before, have you not?

"A. No.

"Q. You've seen this knife in your own home before?

"A. Yes.

"Q. Now, on July the 13th of 1970 in the City of Los Angeles did you possess a similar type of knife?

"MR. BASKIN: Objection, Your Honor, not relevant, beyond the scope of direct examination.

"THE COURT: Overruled.

"THE WITNESS: I cannot answer.

"MR. JOHNSON: Q. You cannot answer? Is there some reason?

"THE COURT: Give her a chance, she's trying to say. She said I could not answer because—

"THE WITNESS: It might incriminate me.

"THE COURT: Read the answer back.

"(Record read by the reporter.)

"THE COURT: You may sit down, sir. I just didn't want you walking around. I want the witness to be in a calmer situation.

"MR. JOHNSON: Will the Court direct her that she does not have the right to refuse to answer on the grounds it may tend to incriminate her because it will not incriminate her if she merely possessed this knife.

"THE COURT: Yes. The question was, Ma'am, as to whether or not you possessed such a knife on July 13th, 1970, and your response has been that you could not answer that question because it might incriminate you. I feel that her response is adequate because I don't know what your next question might be and what it might lead to. She and her attorney, who had an opportunity to talk to her after we met at the bench, were able to consult but I am not going to sustain her right to base her refusal to answer on the basis that it might tend to incriminate her because she

doesn't have to answer any questions that might in itself incriminate or that might lead to something.

"MR. JOHNSON: The mere fact that she, if in fact she did possess a weapon like this, on a street in the City of Los Angeles on July the 13th of 1970 in no way would tend to incriminate her, the mere possession—a person can walk around with a knife if in fact it's not concealed and if that person does not use it.

"MR. BASKIN: I wouldn't advise it, Your Honor. Furthermore, I think the question is not relevant.

"THE COURT: That wasn't a question. That was addressed to the Court. I've made my ruling.

"MR. JOHNSON: Q. Have you ever had a butcher knife similar to the one that is sitting here on the table in your possession at a time other than in your household?

"MR. BASKIN: Objection, Your Honor, not relevant, beyond the scope of direct examination. Also, I'd raise the same objection as to possible violation of my client's rights under the Fifth Amendment.

"THE COURT: Sustained under the provisions of Section 352 of the Evidence Code. She could have been in someone else's house, she could have been in a store, it will just open up an area that—

"MR. JOHNSON: Q. Have you ever been to North Rodney Street in the City of Los Angeles?

"MR. BASKIN: Objection, Your Honor, not relevant, beyond the scope of direct examination, has no relevancy to her direct testimony.

"THE COURT: Better come up and we'll talk softly at the bench. You can make an offer of proof.

"(Off the record discussion.) . . .

"Q. Now, isn't it true that on another occasion on July the 13th of 1970 because your boy friend was going around with another girl that you engaged in an altercation with him using a similar type of knife as I have in my hands at this time?

"MR. BASKIN: Your Honor, at this point I'd like to object to that question as beyond the scope of direct examination. For Mrs. Bagwell to answer that would be in violation of her privilege under the Fifth Amendment and the Fourteenth Amendment of the United States Constitution and I think under 352 of the Evidence Code an answer to that question should not be allowed.

"THE COURT: Well, I'll exercise my discretion under 352 to say that she may answer the question or she may exercise her privilege that she's previously answered. The question is relevant and may be asked by the prosecuting attorney.

"MR. JOHNSON: Isn't it true then that on July the 13th of 1970 because your boy friend at that time, Mr. Saffiotti, was going with another girl that you went after him with a butcher knife similar to the one I have in my possession?

"A. I don't want to answer because I don't want—because I don't know about it.

"THE COURT: Do you want to talk to your client?

"MR. BASKIN: Yes, Your Honor.

"THE WITNESS: I refuse to answer because it might incriminate me.

"MR. JOHNSON: May I ask the Court at this time if the Court is going to—

"THE COURT: If you are going to ask the question, come up here so we don't have to try to unring a bell.

"(Off the record discussion.)

"MR. JOHNSON: Q. About 9:30 at night on July the 13th of 1970 while you were in the company of a Mr. Fred Saffiotti on North Rodney Street in Los Angeles, did you see a person by the name of Larry Baca?

"MR. BASKIN: Same objection, Your Honor, beyond the scope of direct examination, violates the privilege against self-incrimination. Its prejudicial effect outweighs its probative value. I advise my client not to answer.

"THE COURT: Sustained. In addition, it would be irrelevant as to who she may have seen.

"MR. JOHNSON: Q. Isn't it true that on that same night of July the 13th of 1970, it was necessary for a person by the name of Larry Baca to remove forcibly from your hand a butcher knife similar to the one I have in my possession?

"MR. BASKIN: Couple of objections. For her to testify as to what was necessary for Larry Baca to do would be beyond her personal knowledge and call for speculation on her part. Second of all—

"THE COURT: Reframe your question.

"MR. JOHNSON: Q. Do you know Larry Baca?

"A. No.

"MR. BASKIN: Objection, not relevant.

"THE COURT: Her answer may stand, no.

"MR. JOHNSON: Q. Have you ever known Larry Baca?

"THE COURT: You shook your head but this time you didn't answer.

"THE WITNESS: No.

"MR. JOHNSON: Q. Do you recall whether or not some person removed a butcher knife from your hand on the evening of July the 13th of 1970 on North Rodney Street in the City of Los Angeles?

"MR. BASKIN: Objection, Your Honor, beyond the scope of direct examination, violation of the privilege against self-incrimination.

"THE COURT: She may exercise her privilege. She may exercise her privilege if that's what she wants to do, but that's an objection.

"MR. BASKIN: The question is still beyond the scope of direct examination.

"THE COURT: Overruled on that ground.

"MR. JOHNSON: Q. Did Larry Baca remove a knife similar to the one —a twelve inch butcher knife from your hand on July the 13th of 1970 on North Rodney Street in the City of Los Angeles?

"A. Yes.

"MR. BASKIN: Your Honor, could I have a word with my client please?

"THE COURT: Surely.

"(Off the record discussion.)

"MR. BASKIN: Your Honor, I believe my client wishes to exercise her privilege under the Fifth Amendment as to that last question.

"MR. JOHNSON: There was an answer given. Is that answer going to stand or be stricken?

"MR. BASKIN: We have a geographical problem in terms of advising my client. I think it's pretty clear that she doesn't wish to answer these questions, the questions are beyond the scope of direct examination. I'd like the Court to grant her a continuing privilege against self-incrimination under the Fifth Amendment.

"THE COURT: She always has that. I don't know whether she has to exercise it because I don't know the problem.

"MR. BASKIN: The problem is in terms of understanding the Constitutional law, and what the advice of her attorney is, that's the problem.

"THE COURT: If there were an answer and it was heard by the reporter and any members of the jury, it will be stricken and they are to disregard it. The question will be reread and we will see if she answers, but I want to ask you to answer audibly and not just shake your head negatively or affirmatively or shrug your shoulders or something. Whatever you want to communicate to us, say audibly and not by other motions. Would you read the question back please?

"(Record read by the reporter.)

"THE WITNESS: I do not want to answer because the answer may tend to incriminate me. ·

"THE COURT: Counsel has indicated that he would be advising her not to answer these questions so move to another area.

"MR. JOHNSON: Q. Was Mr. Fred Saffiotti your boy friend?

"MR. BASKIN: Objection, Your Honor, the question goes beyond the scope of direct examination, violates my client's privilege under self-incrimination, under the doctrines of the Fifth and Fourteenth Amendments and the prejudicial effect would outweigh its probative value. I would advise my client to exercise her privilege as she has before.

"MR. JOHNSON: Whether somebody was his boy friend or her boy friend on a certain date doesn't incriminate anybody.

"THE COURT: I don't feel—

"MR. BASKIN: Your Honor, may we approach the bench, please?

"THE COURT: Surely.

"(Off the record discussion.)

"THE COURT: I would rule that the question is—might be answered that it didn't come within the objections that you had raised but as a result of our conversation at the bench I understand he's withdrawn the question. He may ask any other questions but he may proceed. He may reask the question if he's so inclined, but to put our record straight, this is the present status. . . ."

As we have indicated, from the trial court's earlier remarks, "We'll see how the testimony goes on her direct examination," the defendant may have been lulled into a sense of security that if she, on direct examination, made no mention of the Los Angeles affair no cross-examination on

the subject would be allowed. If advised that the court would rule as it did she might well have refrained from testifying at all. Without either her explanation of the stabbing or her cross-examination, the jury might well have returned a manslaughter verdict rather than one of second degree murder.

Furthermore, we observe no purpose on the part of the trial court to rescind or modify its previous order disallowing evidence of the claimed Los Angeles assault. This seems clear from the court's mention of Evidence Code section 352, its sustaining of objections that the "prejudicial effect outweighs the probative value," its apprehension of what the questions "might lead to," and its desire not to have to "unring a bell."

Yet the prosecutor persisted, with the court's sufferance, in asking questions about July 13, 1970, in Los Angeles and whether at that time she had a butcher knife with which she went after a boy friend, making it necessary for someone to remove the "butcher knife from your hand." Indeed, before her attorney could object she had, on one occasion answered "Yes" to the question, "Did Larry Baca remove . . . a twelve inch butcher knife from your hand on July the 13th of 1970?"

We are advised of no theory, and we are aware of none, that permits cross-examination on such an unrelated offense not adverted to on direct examination, except the theory allowing proof of a similar offense to establish intent. (See Evid. Code, § 1101.) But the trial court had expressly disallowed that approach, finding the prejudicial effect too great. Allowance of such cross-examination was therefore error. And there can be no doubt of the gross prejudice ensuing from the improper questions, defendant's refusal to answer on the grounds of self-incrimination and her unguarded inculpatory answer.

Further, under the circumstances here, forcing defendant to testify on cross-examination to matters not covered on direct examination, violated her rights under the Fifth and Fourteenth Amendments. (See Evid. Code, § 773, subd. (a); *People* v. *Schader,* 71 Cal.2d 761, 770 [80 Cal.Rptr. 1, 457 P.2d 841]; *People* v. *Arrighini,* 122 Cal. 121, 126-127 [54 P. 591]; *People* v. *Sims,* 165 Cal.App.2d 108, 110-114 [331 P.2d 799]; *People* v. *McCarthy,* 88 Cal.App.2d 883, 886-887 [200 P.2d 69]; *People* v. *Gilliland,* 39 Cal.App.2d 250, 260-262 [103 P.2d 179].)

We, of course, make no determination what the trial court's ruling at the next trial should be, upon renewed and properly supported motions to produce evidence, or cross-examine, on the alleged Los Angeles stabbing. Nor do we purport to suggest what ruling should be made if the

court is again called upon to exercise its discretion under Evidence Code section 352.

Because of the error we have pointed out the judgment must be reversed.

Reversed.

Molinari, P. J., concurred.

**SIMS, J.**—I concur in the decision that the judgment must be reversed. I believe that the cross-examination of the defendant concerning the incident of July 13, 1970, when she attacked her friend Fred Saffiatti in Los Angeles with a knife, was proper. In *People* v. *Schader* (1969) 71 Cal.2d 761 [80 Cal.Rptr. 1, 457 P.2d 841] the court upheld cross-examination concerning a prior offense which was designed to and which elicited material evidence which rebutted the accused's testimony that he was not actively participating in the robbery in which the homicide occurred, and his assertion that the killing occurred accidentally. (71 Cal.2d at p. 777. Cf. *People* v. *Sims* (1959) 165 Cal.App.2d 108, 110-115 [331 P.2d 799], cited but distinguished in *People* v. *Schader, supra,* 71 Cal.2d at pp. 769-771.)

Nevertheless there was error in permitting this cross-examination because of the court's earlier rulings. At the close of the prosecution's case the prosecutor made the following offer of proof concerning both an assault on, and the murder of, the defendant's former boy friend: ". . . First of all, Your Honor, we would show that on July the 13th of 1970 the defendant in this action under the name of Veronica Villarus was acquainted with and a friend of Mr. Fred Saffiotti and there was a relationship between the two prior to that date of July the 13th of 1970. Now, we would show that on this date of July the 13th of 1970 Veronica Bagwell came to the apartment of Mr. Fred Saffiotti and when Mr. Saffiotti in fact left his home after she had attempted to gain access to the house, she produced a knife, a twelve inch butcher knife, from within her coat that she was wearing and attempted to cut the victim Mr. Saffiotti. Saffiotti at this time grabbed her arm which held the butcher knife and hollered out for help. Now, a Mr. Larry Baca who is under subpoena would testify that he heard the cries for help, he looked out his window and observed the defendant Mrs. Bagwell in possession of the butcher knife; that he went out of his apartment downstairs and took the knife away from Mrs. Bagwell,—Mrs. Villarus—but the defendant in this action. At that time the police were called and Mrs. Villarus was arrested

for violation of Section 245 of the Penal Code and taken down to police headquarters." With respect to the murder there was an offer to show that the victim of the first offense was last seen alive on the evening of July 31, 1970, and found stabbed to death on the early evening of August 2, 1970, and that the defendant had returned to her room at 5 a.m. on August 1, 1970, packed and left, and never communicated with her room-mate again except to phone her and tell her to move out.

The court made the ruling, set forth in the majority opinion, that it would exclude the direct evidence, although it might be material to show intent, malice, or premeditation, because its probative value was out-weighed by its possible prejudicial effect. Counsel for the defendant then pressed the court for a ruling as to whether cross-examination would be permitted on those matters. He stated: "There's the dilemma she faces. Is she going to be forced into a position where she may have to decide not to take the witness stand to defend herself as to these charges because she's going to be subjected to cross-examination on the Los Angeles charges in what we could consider to be in violation of her rights as to those charges, that's the box she's in." The court, after listening to argu-ment, indicated, "I will have to wait to see how it develops. I can't rule in a vacuum but we've discussed the cases . . . as far as her questions are concerned, we'll proceed cautiously and you should get a ruling from the Court before we get into an area that may be within this orbit that we've just discussed so after the direct examination if you feel there's any area you can go into, [the prosecutor], then we should either by approach-ing the bench or in some other way have some discussion as to what the limitations might or might not be. . . . We'll see how the testimony de-velops on her direct examination. It's the only way they could reach a decision in these other cases."

On this record the defendant may have been lulled into a sense of security that the court would adhere to its original ruling with respect to the direct evidence, insofar as nothing was raised by the defendant con-cerning the prior incidents. It is for this reason that I would reverse the judgment. If advised that the court would rule as it did, the defendant might well have refrained from testifying. Without either the defendant's explanation, or the prejudicial, although otherwise proper cross-examina-tion, the jury might well have found the defendant guilty of manslaughter rather than second degree murder.

Defendant's victory may be pyrrhic. Another judge in another court may admit the direct evidence of the July 13, 1970 stabbing. The circum-stantial nature of the evidence concerning the homicide in Los Angeles

tends to lessen its probative effect, but if in the interim it rose to the level of a prior conviction, *People* v. *Schader, supra,* would indicate that the details could be used to show the motive and intent in connection with the instant offense.

A petition for a rehearing was denied April 17, 1974, and respondent's petition for a hearing by the Supreme Court was denied May 22, 1974. McComb, J., Burke, J., and Clark, J., were of the opinion that the petition should be granted.