[Civ. No. 41653. Second Dist., Div. Two. Apr. 23, 1973.]

THE PEOPLE, Petitioner v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
FRED HARVEY FALL et al., Real Parties in Interest.

**COUNSEL**

Joseph P. Busch, District Attorney, Harry B. Sondheim and Robert J. Lord, Deputy District Attorneys, for Petitioner.

No appearance for Respondent.

Fred De Luca, Jr., Samuel B. Picone, Bruce J. Brothers and David W. Kwan for Real Parties in Interest.

**OPINION**

**COMPTON, J.**—Pursuant to subdivision (o) of Penal Code section 1538.5, the People petition for a writ of mandate to require the superior court to set aside its order suppressing the use as evidence of a quantity of marijuana and peyote taken in execution of a search warrant.

The pertinent portion of the affidavit of Sergeant Weir of the Los Angeles Police Department, which served as a basis for the issuance of the search warrant, reads as follows:

"About 6 or 7 weeks ago Affiant received information that persons were selling and using marijuana at the location in question. That at about 7:00 p.m. on Feb. 7, 1972, affiant and another officer went to the location, 1040 So. Longwood Ave., Los Angeles, and found a two story house. They knocked on the door and the door was answered by Fred Fall; they asked to speak to the occupants of the house and Fall led them upstairs where another door was opened and they met Steve Goldfisher, who let the officers in and inside they were met by Marc Baskin. They all spoke for a few minutes and the officers asked if anyone else was in the house. The officers had informed the above 3 persons of the reason for their call. The affiant asked Fall to lead him into the other parts of the house to see if there were any other occupants and Fall willingly did so, explaining who lived where in the house. As affiant was led through the kitchen portion of the house, he saw, in plain view, a plastic cannister containing plant material which appeared to be marijuana. Affiant asked Fall what it was, and Fall said 'grass.' Grass is a common word for marijuana. Affiant also saw a plate in a nearby drawer, also in plain view, containing what appeared to be finely manicured marijuana. It appears to affiant that the marijuana is being taken from some larger quantity, cut up with a knife, the rough parts in the plastic cannister, the finely manicured part put in the plate and then into packages for later sale or use. Affiant returned to the other room and asked all the occupants for permission to search the premises. All the occupants refused permission to search. . . . A search of the location will also reveal the larger quantity that is being cut up and the materials and paraphernalia used to package, sale and use the marijuana. . . . This location is occupied by a number of people and a number of people have access to the location, and unless the marijuana is immediately located and confiscated, it will be moved or destroyed by other persons with access to this house."

.Having in mind defendants' contentions, as they subsequently came to be, we call attention to the averments that "Fall led them [the officers] upstairs," that "Steve Goldfisher . . . let the officers in," and that "the affiant asked Fall to lead him into the other parts of the house to see if there were any other occupants and Fall willingly did so."

Defendants initially moved in the municipal court "to traverse the search warrant," presumably pursuant to subdivision (b) of Penal Code section 1538.5.[1] That motion was heard and determined at the same time as the

---

[1]Penal Code section 1538.5, subdivision (b) provides: "When consistent with the procedures set forth in this section and subject to the provisions of Section 170 through 170.6 of the Code of Civil Procedure, the motion should first be heard by the magistrate who issued the search warrant if there is a warrant."

preliminary examination. The contraband and evidence were admitted by the magistrate and the defendants were held to answer. The defendants then brought their motion in the superior court to suppress the items. (Pen. Code, § 1538.5, subd. (i).) The motion, however, was submitted upon the transcript and exhibits of the municipal court proceedings and no additional evidence was received in the superior court.

That court suppressed all of the items, apparently upon its view that the original entries by the police officers were violative of Penal Code section 844. No issue was raised concerning the officers' compliance with Penal Code section 1531 at the time they returned with the search warrant.

The People contend that since the officers entered the premises by consent, Penal Code section 844 does not apply. Their reliance is upon the holding in *Mann* v. *Superior Court,* 3 Cal.3d 1, 9 [88 Cal.Rptr. 380, 472 P.2d 468], that section 844 does not apply where officers' entry was consented to by persons present inside the house. The defendants contend, as they have from the beginning, that "under the facts and circumstances presented in this case, the [superior] court properly applied the requirements of Section 844 of the Penal Code." Alternatively (or perhaps conjunctively) they contend (by reference to facts recited hereinafter) that "the entry into the stairwell area, the entry into the apartment and the preliminary search of the apartment were all unlawful as no lawful consent was given for such entries or search."

To resolve these parties' contentions it seems necessary to recite the evidence in some detail and, because the procedure itself is at least remarkable, we recite the evidence in its procedural context.

The hearing on defendants' motion to "quash the search warrant" began with the suggestion of various particulars wherein the affidavit was asserted to be inadequate, but it was ruled "sufficient on its face." Without mention of any respect in which the affidavit might have contained a "misstatement" and in the absence of any offer of proof of any kind, the inquiry turned to the accuracy of the factual assertions in the affidavit. (Compare *Theodor* v. *Superior Court,* 8 Cal.3d 77 [104 Cal.Rptr. 226, 501 P.2d 234].) In *Theodor,* at page 101, it was stated: "Applying the general rule it is manifest that the defendant must carry the initial burden of demonstrating the inaccuracy of allegations set forth in the affidavit. A presumably reliable person has attested to the truth of the matters alleged in the affidavit and a magistrate has in the exercise of his impartial function determined that the affidavit was truthful and acted upon it." Thus, the court concluded at page 103, "Before a hearing is required to test the

veracity of an affidavit, the defense must relate, with some specificity, its reasons for contending that the affidavit is materially inaccurate."

In the case at bar it appears that the defendants failed to carry the burden which was necessary to entitle them to a contravention hearing. (See *People* v. *Hambarian* (1973) *ante*, p. 643 [107 Cal.Rptr. 878].) The deputy district attorney apparently did not grasp the limitations and implications of *Theodor* and failed to interpose any objection. We, therefore, are required to consider the evidence taken at the hearing.

The defendants called Sergeant Weir, the affiant, as their single witness and he was examined as on cross-examination by separate counsel for the three defendants and Marc Baskin.

Defendants' contentions, as reflected in their examination of Sergeant Weir and as they have remained, are essentially that Fall was a "visitor" rather than an "occupant" and thus was not privileged to give any of the permissions that he gave; that he did not in fact consent to the officers' initial ascending of the stairs; that Goldfisher and Fall did not assent to their entry into the apartment; that Goldfisher and Marc Baskin, unlike Fall, did not manifest their consent to Sergeant Weir's being led through the common areas of the apartment; and that somehow, as subsequently concluded by the superior court, the officers' entries through both the downstairs and upstairs doorways were violative of Penal Code section 844. The sergeant's exact testimony on each of these points is difficult to repeat because he was separately examined four different times and because he was interrupted and not permitted to explain his answers. However, his notable answers on each point, beginning with the initial downstairs entry, will be recited.

Sergeant Weir knocked on the downstairs door and it was opened by Fall. The sergeant identified himself by showing his badge and asked Fall if he were Mr. Olshan (the only specific name mentioned in the sergeant's pre-existing information about marijuana activity). Fall said "No" and gave his name. He was asked if he had identification and he said, "No, it was upstairs." He was asked if he lived at the premises and he said "that he was visiting." The sergeant then inquired if "Mr. Olshan was on the premises" and Fall replied "No." The next inquiries and answers were "How many other people are upstairs?"; "One"; "Who's that?" "Marc"; "Does he live here?"; "Yes, Marc lives here"; "Well, I'd like to talk to Marc." As an addendum to that statement in his testimony, the sergeant added "And we walked up the stairs to the second door leading to the top floor of the apartment." (No questions were asked in immediate

clarification of that addendum, but it was later to assume great importance in the superior court's ruling.)[2]

The officers followed Fall up the stairway, Fall first tried the door and then knocked, and Goldfisher opened it. Displaying his badge, the sergeant said, "Hi, are you Marc?" and Goldfisher replied, "No, I'm Steve." Goldfisher told the sergeant that he also lived there and the sergeant inquired, "Well, Fred told us that Marc was the only one in the house. Is there a Marc here?" Goldfisher said, "Yes, Marc is in the back bedroom," and the sergeant replied, "Well, we'd like to talk to him." At this point, Goldfisher "entered us" (*sic*) and started walking down the long hallway and the two officers and Fall followed him to Marc Baskin in a rear bedroom.

The sergeant asked Baskin "Are you Marc and do you live here?" and he stated, "Yes." With Fall and Goldfisher, as well as Baskin, in the room, Sergeant Weir then explained that he and his partner "were at the residence in response to some information that people at this particular residence and a male by the name of Jeffrey Olshan were engaged in selling marijuana and smoking marijuana at that location."

That conversation lasted several minutes and developed that Olshan lived there but was not then at home. It also shed light upon Fall's status with respect to the premises. It developed that Fall shared a bedroom with Olshan and, although mention was made of his having been staying there only three or four days, enough was said to satisfy the sergeant that he was "living there" and was "more than a visitor."[3]

The conversation then turned to other persons who might reside or be present in the apartment. The sergeant's interest was in the officers' safety and "what was going through [the sergeant's] mind: How many other people are—might walk in on us were in the back bedroom." Speaking to the group, but addressing Fall in particular, the sergeant said, "Is anybody else in here? The reason I'm asking, . . . you told me there was one person and now we've found another. Is anybody in any of the other rooms?" After Fall replied, "No," the sergeant asked, "Well do you mind taking me

---

[2]At a later point in his testimony, the questions and answers of Sergeant Weir were thus: "Q. Did you at anytime specifically request permission to enter the location downstairs? A. What do you mean by specifically? Could you be more specific in your question. Q. Well, did you use words this way: May we come in? A. I don't believe I used those words, no. Q. I see. You sort of edged in there; is that right? A. No."

[3]As a matter of fact, a letter subsequently found in the Olshan-Fall bedroom and addressed to Fall at the apartment was postmarked January 13. 1972, or about a month earlier.

around?" and Fall said, "No. Come on." If Goldfisher and Baskin made any response, the sergeant was not asked about it.

Fall showed Sergeant Weir through the premises, but they only walked down the hall and did not enter any rooms. They did look into them, however, and Fall explained the living arrangements. The sergeant "ascertained that nobody else, to the best of my knowledge, was in their living area," but in passing the dining area he saw the marijuana and engaged in the conversation with Fall that he included in his affidavit.

The defendants and Baskin were detained while a search warrant was obtained and executed. (Defendant Olshan was detained on his return to the apartment in the interim.) In addition to the marijuana in the dining area, execution of the warrant produced substantial quantities of marijuana and peyote from the bedroom shared by Fall and Olshan, and of marijuana from Goldfisher's room, as well as various documents indicating their residency at the apartment.

The magistrate found the averments in the affidavit were true and, therefore, that there was no basis upon which to "traverse the warrant." However, he also concluded that "There are certain areas of this apartment which undoubtedly are commonly shared by all of the occupants since there are several. . . . There are also areas which are the personal areas of the individual occupants."[4] For that reason, he based no charges upon the marijuana found in the dining area, and dismissed the complaint against Baskin. For the same reason, he quashed the warrant as to a fourth bedroom occupied by one Fayman who was not otherwise shown to be connected with the events.

As to the voluntariness of the several permissions to the officers, the magistrate concluded "it appears to me that we're dealing with people here, those who were present at the time the officers were in the house, who definitely know how to say no. . . . they had the ability at anytime to arrest the movement of these officers throughout this apartment simply by saying Hey, wait a minute. . . . This is as far as you go right here. Because when the chips were down, that's what they did say. . . . It appears that they acted voluntarily at all times while he [Sergeant Weir] was present in the apartment."

As mentioned, the defendants' suppression motion to the superior court (Pen. Code, § 1538.5, subd. (i)) was submitted upon the municipal court transcript and exhibits and no additional evidence was taken.

---

[4]Counsel (for defendant Olshan) himself argued "There's a sort of a Collis-condominium type of thing where everybody roams around in various type of places, your Honor."

Discussion in the superior court of the identical evidence that was before the magistrate focused upon the officers' entry through the downstairs doorway. That court stated its views and rulings as follows: "Nevertheless, the officers find themselves at the premises, and they in fact knock at the door, and, as we have indicated, this is a two-story residence, and there is apparently an outer door and an upper inner door, the upper inner door affording access to the premises upstairs. . . . So there is ample reason for the requirement that the officer advise anyone and everyone, for that matter, of his presence and his reason for being there. . . . We have reference to the argument that Mr. Fall 'preceded' as distinguished from 'led' the officers up the stairway and whether or not there was an implied admission to enter these premises. *Although the officers could on that occasion have actually concluded that that was an implied consent,* still these are officers who know that on the other hand they are charged with the duty imposed upon them by Penal Code section 844 and should have complied, . . . The district attorney asked the question: 'All right, what further was done about admitting you? What conversation was there with respect to that subject?' He had said everything in his question except 'Did you comply with Section 844 of the Penal Code?' The officer said: 'Then I said, "Well, I'd like to talk to Marc."' And we walked up the stairs to the second door leading to the top floor of the apartment.' Well, in my opinion the whole case lies in [that] gap.[5] Accordingly, your motion to suppress the evidence as to each defendant is granted." (Italics added.)

At a subsequent proceeding the court stated: "My granting of the motion was not predicated alone on the court's finding that section 844 of the Penal Code had not been complied with."

When the evidence which is sought to be suppressed was obtained under authority of a search warrant, Penal Code section 1538.5, subdivision (a) prescribes insofar as is relevant here that "A defendant may move for the return of property or to suppress as evidence any tangible or intangible thing obtained as a result of a search or seizure on . . . the following grounds: . . . The search or seizure with a warrant was unreasonable because (i) the warrant is insufficient on its face; . . . (iii) there was not probable cause for the issuance of the warrant; . . . or (v) there was any other violation of federal or state constitutional standards."

Simply stated, the statute has been interpreted as providing that a search warrant may be attacked in two ways (1) that the information contained in the affidavit upon which the magistrate relied was insufficient as a

---

[5]Compare the note and accompanying text at footnote 2.

matter of law to support a finding of probable cause, or (2) the information, although supportive of a finding of probable cause, was itself "tainted" and therefore incompetent to support the issuance of a search warrant.

Such "taint" may attach by reason of the information's having been gained through noncompliance with Penal Code section 844 (*Greven* v. *Superior Court,* 71 Cal.2d 287, 290-291 [78 Cal.Rptr. 504, 455 P.2d 432]) or a forced, unjustified entry (*People* v. *Haven,* 59 Cal.2d 713, 717-720 [31 Cal.Rptr. 47, 381 P.2d 927]). And, of course, there is "taint" if the information presented to the magistrate is materially inaccurate to the end that the "magistrate's discretion is circumvented." (*Theodor* v. *Superior Court, supra,* 8 Cal.3d 77.)

 In the case at bar the affidavit on its face was clearly sufficient to support a finding by the magistrate of probable cause, the averments being that the officer personally observed the contraband on the premises. Also, the affidavit on its face dispelled any "taint," the averment being that the officers were lawfully on the premises by invitation or consent of the occupants.

Of course, if the latter averments are true then Penal Code section 844 has no bearing upon the case and the superior court's ruling is clearly erroneous in this respect. We reiterate that the record in this case has been unnecessarily enlarged as a result of the testimony taken from Officer Weir in spite of the fact that the defendants offered nothing to indicate that these averments were untrue.

The superior court found as noted that the officers could have concluded that they had consent yet went on to discuss Penal Code section 844. We do not understand the law to recognize gradations under which the same manifestations of consent are judged differently for purposes of determining the applicability of section 844 than for determining whether the officers have any right to enter except by permission. In short, we believe that an unfortunate and impermissible mixture of ideas gave rise to this petition.

By its terms, section 844 applies to "breakings" to effect arrests.[6] Numerous recent decisions have pointed out that the section has no application to consensual entries or to those in which officers are accompanied by occupants. In *Mann* v. *Superior Court, supra,* 3 Cal.3d 1, 8-9, the officers were investigating narcotics activities at a house in which a party was in progress.

---

[6]Section 844 provides: "To make an arrest. . . . a peace-officer, may break open the door or window of the house in which the person to be arrested is, or in which they have reasonable grounds for believing him to be, after having demanded admittance and explained the purpose for which admittance is desired."

They knocked, voices inside responded "Come in," and the officers entered. It was in this factual context that the court said, "Since the officers' entry here was consented to by persons present inside the house, the section does not apply." The court also said, "For these reasons, we hold that the officers acted in a perfectly straightforward and undeceiving way in seeking entry as they did, when they did."

Following *Mann,* this court dealt with a case in which the officers initially had no cause for arrest, but knocked at a residence investigating a kidnapping. It was there said "[T]he provisions of Penal Code section 844, dealing with forcible entries to effect an arrest, were wholly inapplicable in the instant case. . . ." (*People* v. *Johnson,* 15 Cal.App.3d 936, 939 [93 Cal.Rptr. 534].)

The distinction between a demanded "admitting" to effect an arrest and other entries has been explained in several decisions, including *People* v. *Ambrozic,* 8 Cal.App.3d 867, 870-871 [87 Cal.Rptr. 899], where it was held where an entry into a houseboat was not made to arrest any of its occupants, section 844 was inapplicable. ■ The paramount purpose of section 844 is, as stated in *People* v. *Rosales,* 68 Cal.2d 299 [66 Cal.Rptr. 1, 437 P.2d 489], "to preclude violent resistance to unexplained entries and to protect the security of innocent persons who may also be on premises where an arrest is made."

The limitation of section 844 to "breakings" (in the technical sense) has also been made clear in recent decisions. In *People* v. *Superior Court (Proctor),* 5 Cal.App.3d 109, 113, 115 [84 Cal.Rptr. 778], the court dealt with a situation in which officers followed a purchaser of marijuana into a residence and said: "The exclusionary rule based upon a failure of compliance with the provisions of Penal Code section 844 applies only where there has been a breaking. The word 'break' in the context of section 844 is a term of art which includes more than the physical breaking of a door or window. It thus encompasses the opening of an unlocked screen door (*People* v. *Rosales,* 68 Cal.2d 299 . . .; see also *Sabbath* v. *United States,* 391 U.S. 585 . . .), and entry through an open door 'at nighttime when the occupant apparently is asleep.' (*People* v. *Bradley,* 1 Cal.3d 80, 87 . . . .) The right protected by Penal Code section 844, while substantial, is of a lesser magnitude than that protected by the more general requirement of probable cause for a search. The section in essence requires that the occupant of premises be given notice before the police break into it. Its purpose is to minimize 'the consequences of an unannounced intrusion' and the consequent 'resistance to the intruders and violent death or injury to them or others including innocent third parties.' (*People* v.

*Bradley,* 1 Cal.3d 80, 88 . . . .)" (See also *People* v. *Veloz,* 22 Cal. App.3d 499, 502-504 [99 Cal.Rptr. 519]; *People* v. *Peterson,* 9 Cal. App.3d 627, 631-633 [88 Cal.Rptr. 597]; *People* v. *Ramirez,* 4 Cal. App.3d 154, 157-158 [84 Cal.Rptr. 104].)

Intertwined with their contention that section 844 was violated, defendants have contended that no consent was manifested or that such consent as was manifested was a submission to an assertion of police authority.

Of course, such contentions are not borne out by anything to be found in the affidavit. The actions of the officers are described in the affidavit and are within the rule that police officers are privileged to investigate complaints or information respecting criminal activity, to interview and seek interviews with persons in that regard, and to call upon them at their homes in order to do so. No doubt has existed as to this privilege since *People* v. *Michael,* 45 Cal.2d 751, 753, 754 [290 P.2d 852], wherein it was applied, explained and justified. (See also *People* v. *Boone,* 2 Cal. App.3d 66, 69 [82 Cal.Rptr. 398]; *People* v. *Bost,* 218 Cal.App.2d 394, 398-399 [33 Cal.Rptr. 10].)

Moreover, unlike an unlawful arrest or entry or other display of unlawful authority, exercise of the privilege ordinarily does not vitiate any consents given in connection with it. As stated in *People* v. *Burke,* 47 Cal.2d 45, 49 [301 P.2d 241]: "It was not unreasonable for the officers, without any show of force or coercion, to call upon the suspected defendant at his home, or to ask him questions, or to accept defendant's statement, 'No, go ahead,' in answer to the inquiry, 'You don't mind then if we search your apartment[,] do you?' "

In this case, of course, there was no search and no request for permission to do so until the end of the events, when such permission was refused and the refusal was honored by the officers. Neither the officers' entry, their permitted walking through the common areas, nor their observing of the marijuana in plain sight constituted a "search." (See *Coolidge* v. *New Hampshire,* 403 U.S. 443, 465 [29 L.Ed.2d 564, 582, 91 S.Ct. 2022]; *People* v. *Marshall,* 69 Cal.2d 51, 56 [69 Cal.Rptr. 585, 442 P.2d 665]; *People* v. *Sandoval,* 65 Cal.2d 303, 308 [54 Cal.Rptr. 123, 419 P.2d 187]. See also *People* v. *Block,* 6 Cal.3d 239 [103 Cal.Rptr. 281, 499 P.2d 961].)

Thus it is clear that the superior court's ruling was not based on any insufficiency or "taint" disclosed by the affidavit itself. The ruling, though not clearly articulated, was of necessity based on a finding that the expanded testimony given by the officer at the hearing on the "motion to quash"

demonstrated that the affidavit was materially inaccurate under the authority of *Theodor, supra.*

The superior court did not question the credibility of the officer in his testimony and since a witness is presumed to speak the truth we will not presume, in the complete absence of contradictory evidence, that the superior court rejected the officer's testimony. Consequently we now examine that testimony in light of the defendant's contentions and the superior court's ruling which totally disregarded the findings of the magistrate.

We assume (without deciding) that the usual rule under subdivision (i) pertains, i.e., that "Even where the issues are submitted upon the transcript of the preliminary hearing, the credibility of witnesses, the weight of the evidence, and the inferences to be deduced from the evidence in the transcript remain as matters for the trier of fact [specifically, the superior court]." (*People* v. *Levy,* 16 Cal.App.3d 327, at p. 333 [94 Cal.Rptr. 25]. See also *People* v. *Harrington,* 2 Cal.3d 991, 996-997 [88 Cal.Rptr. 161, 471 P.2d 961]; *People* v. *Heard,* 266 Cal.App.2d 747, 749 [72 Cal.Rptr. 374].) The foregoing, of course, stems from the consideration that the superior court's function under subdivision (i) is not a review of any kind, but is a "de novo" determination in a "special hearing." ("The defendant shall have the right to litigate the validity of a search or seizure de novo on the basis of the evidence presented at a special hearing.") (Pen. Code, § 1538.5, subd. (i).)

Nonetheless, there is a basic incongruity in a de novo determination in the superior court of the truth of the averments in a search warrant affidavit and the credibility (both in his averments and in his testimony) of the affiant who made them. The oft-proclaimed deference due the magisterial function in issuing and receiving search warrants is lost altogether.[7]

---

[7]The regard ordinarily afforded a magistrate's search warrant determinations was stated in *Skelton* v. *Superior Court,* 1 Cal.3d 144, 153-154 [81 Cal.Rptr. 613, 460 P.2d 485], as follows: "Such a holding (that the statement . . . *cannot* as a matter of law, be believed by the magistrate) would be contrary to the rule that in determining probable cause for purposes of indictment or commitment the credibility of the witnesses is for the determination of the grand jury and the magistrate, respectively. [Citation.] 'The credibility of witnesses at the preliminary examination, of course, is a question of fact within the province of the committing magistrate to determine, and neither the superior court nor an appellate court may substitute its judgment as to such question for that of the magistrate.' [Citations.] No persuasive distinction between the role or capacity of the magistrate in these settings has been suggested. In the absence of such a suggestion or of any circumstances appearing in the record which should have alerted the magistrate to a likelihood of deliberate mendacity on the affiant's part, we decline to hold that the warrant was issued without probable cause.

"We rest our holding squarely on the rule that it is for the magistrate to determine the credibility of witnesses and affiants providing information under oath."

We are aware that much of that deference has been paid to magistrates' rulings as to the sufficiency of affidavits, rather than to their determinations as to any "taint" that may attend the information. However, where defendants challenging a warrant offer no evidence at the municipal court level other than an unsuccessful effort at impeachment of the affiant officer, and no additional evidence to the superior court, any functional difference between determining sufficiency and taint is not apparent. Of course, some of the search warrant determinations under subdivision (i) are genuinely de novo, as where the municipal court proceedings have consisted only of a preliminary examination (subd. (f)) rather than of a "traverse of the warrant" (subd. (b)), or where the defendant has been indicted by the grand jury, but this is not such a case.

The magistrate who personally observed the officer fully accredited his testimony. A reading of that testimony discloses no variance between it and the conclusionary averments of the affidavit. Further, that testimony fully supports the finding of the magistrate and comports with the observations we made in testing defendant's contentions against the affidavit. The additional testimony in fact strengthens the affidavit.

The suggestion in this case that Fall may have been a mere "visitor" (although he proved to have been an "occupant" of one of the bedrooms at least) to whom no notice could be effective and who could give no consent to entry, not even to the downstairs door, will not stand analysis.

It has been said that the fact that a person answers the door is a demonstration of apparent authority. (*People* v. *Misquez,* 152 Cal.App.2d 471, 479-480 [313 P.2d 206].) As said in *People* v. *Lamb,* 24 Cal.App.3d 378, at page 381 [101 Cal.Rptr. 25], "The officers were entitled to believe that she [encountered on the porch] was a person authorized to give consent to entry and that notice to her was all that section 1531 [counterpart of section 844] required."

Further, although Fall said that he was a "visitor" rather than a "resident," he readily demonstrated that he knew how to contact those present and did so, and that was all that became of his admittance of the officers downstairs. With respect to an "admittance" more dubious than that one, it has been held that the permission to enter was "ratified" by the resident. (*People* v. *Hunter,* 218 Cal.App.2d 385, 393 [33 Cal.Rptr. 15].)

In *Greven* v. *Superior Court,* 71 Cal.2d 287, 289 [78 Cal.Rptr. 504, 455 P.2d 432], relied upon by these defendants, the officers were attempting to gain entry into a "Hippie type pad." They knocked, *received no*

*answer,* and entered. That entry was held violative of section 844 for the same reasons that this one should have been held not to be.

As to cooccupancy (which proved to be the state of affairs in this case), and even as to permission to search rather than merely to enter, the governing rule has been stated thus: "[A] search is not unreasonable if made with the consent of a cooccupant of the premises who, by virtue of his relationship or other factors, the officers reasonably and in good faith believe has authority to consent to their entry." *(People* v. *Smith,* 63 Cal.2d 779, 799 [48 Cal.Rptr. 382, 409 P.2d 222].)

The officers' activity in this case having complied fully with these more stringent principles applicable to search, surely should not have been regarded as violative of section 844.

The question reduced to whether they were lawfully where they were when they saw the contraband. Defendants contend, in essence, that they were not because Fall and Goldfisher did not verbally express their permission for the officers to enter.

However, "a consent to enter may be expressed by actions as well as words." *(People* v. *Harrington, supra,* 2 Cal.3d 991, at p. 995. See also *People* v. *Baca,* 198 Cal.App.2d 391, 395-396 [17 Cal.Rptr. 779]; *People* v. *Yancy,* 196 Cal.App.2d 665, 667 [16 Cal.Rptr. 766].) In *People* v. *Sproul,* 3 Cal.App.3d 154, at page 162 [83 Cal.Rptr. 55], for example, officers having no right to enter except by permission knocked and encountered defendant's mistress, a "joint occupant." The court said: "Although Mrs. Sproul did not verbally invite the officers into the apartment, her actions in opening the door and stepping back when Officer Lay asked if they could come in, was conduct upon which the officers could rely in good faith as constituting an invitation to enter."

To the same effect, see *People* v. *Contreras,* 211 Cal.App.2d 641, at page 645 [27 Cal.Rptr. 619]; *People* v. *Smyre,* 164 Cal.App.2d 218, 224 [330 P.2d 489]; *People* v. *Holland,* 148 Cal.App.2d 933, at page 935 [307 P.2d 703].

The *Contreras* and *Holland* decisions are especially pertinent to the inordinate emphasis given in the superior court to the fact that the transcript of the "traverse" proceedings did not reflect any explicit request by the officers for permission to enter the downstairs doorway and that Fall did not "invite" them in before he "preceded" or "led" them up the stairs. In *Contreras,* the court observed, "Here, all we have is the simple statement that [the person] opened the door and the officer entered." In

*Holland,* the statement was ". . . he opened the door about three-quarters of the way and stepped back from the door; the officers entered." In both of those decisions the entry was held to be consensual. By comparison the contentions in this case that Fall and Goldfisher did not manifest their assent to the officers' entries into the stairwell and hallway border on the frivolous.

Giving full deference to the "de novo" nature of the superior court proceedings, our duty becomes one of determining whether the resulting ruling is supported by any substantial evidence. We conclude that on the state of this record the order of suppression finds no such support.

Accordingly, let a peremptory writ of mandate issue commanding respondent court to annul its order of January 3, 1973, granting the motion of real parties in interest to suppress evidence and to make a new and different order denying that motion.

Roth, P. J., and Herndon, J., concurred.

The petition of the real parties in interest for a hearing by the Supreme Court was denied June 20, 1973.